**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DANIEL LEE and DANIEL YEE, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BLOCKRATIZE, INC. d/b/a POLYMARKET, QCX LLC, QC CLEARING LLC, QC TECH LLC, and ADVENTURE ONE QSS, INC.,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Daniel Lee and Daniel Yee (collectively "Plaintiffs"), on behalf of themselves and all others similarly situated (the "Class Members"), bring this class action suit for damages and equitable relief against Defendants Blockratize, Inc. d/b/a Polymarket, QCX LLC, QC Clearing LLC, QC Tech LLC, and Adventure One QSS, Inc., ("Polymarket" or "Defendants"). Plaintiffs allege the following based upon personal information as to allegations regarding themselves, and the investigation of their counsel, and on information and belief as to all other allegations:

## INTRODUCTION

1. This is a consumer protection class action challenging Defendants' operation and promotion of the "Polymarket" platform as a lawful, regulated sports wagering marketplace in the United States.

2. Following years of regulatory prohibitions and enforcement action, Defendants reentered the U.S. market beginning in late 2025 and expanding through 2026, publicly representing that the platform operates legally and in compliance with federal and state law.

3. Those representations are false and misleading. In reality, Defendants' platform offers contracts that function as sports wagers while lacking required licensure under state law and operating in conflict with federal restrictions governing "event contracts."

4. Defendants have uniformly marketed Polymarket as a lawful, authorized platform for sports wagering, including with claims that it is legal throughout the United States and otherwise compliant with federal and state law.

5. At the same time, regulators, courts, and lawsuits have repeatedly characterized Polymarket as an unlicensed sports betting enterprise and have taken enforcement action to halt its operations.

6. Plaintiffs and Class members were misled into believing they were participating in lawful sports wagering. In reality, they at best purchased sports event contracts whose legality was uncertain and at worst engaged in illegal sports gambling. Had consumers known those facts, they would not have purchased sports events contracts on Polymarket's App or would have paid less to do so.

## PARTIES

7. Plaintiff Daniel Lee ("Lee") is an individual consumer who, at all times material hereto, was over the age of 18 and was a resident of the State of California. Lee is a resident of San Francisco, California.

8. Lee used the Polymarket App to purchase event contracts tied to the outcomes of sporting events.

9. Plaintiff Daniel Yee ("Yee") is an individual consumer who, at all times material hereto, was over the age of 18 and was a resident of the State of California. Yee is a resident of San Ramon, California.

10. Yee used the Polymarket App to purchase event contracts tied to the outcomes of sporting events.

11. Defendant Blockratize, Inc. d/b/a Polymarket is a Delaware corporation with its headquarters and principal place of business in New York City, New York.

12. Defendant Adventure One QSS, Inc. d/b/a Polymarket.com is a Panama corporation with its principal place of business at 1280 Lexington Avenue, Suite 1448, New York, New York 10028.

13. Defendant QCX LLC, QC Clearing LLC, and QC Tech LLC, d/b/a Polymarket US, are Delaware entities with their principal place of business at 7251 W. Palmetto Park Road, Suite 102, Boca Raton, Florida 33433.

14. Defendants own and/or operate Polymarket, an online platform through which users buy and sell "Yes" or "No" positions on the occurrence of real-world events, including sports outcomes.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act ("CAFA"). 28 U.S.C. § 1332(d). CAFA jurisdiction is appropriate because there is diversity in citizenship between the parties, there are 100 or more Class Members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

16. This Court has personal jurisdiction over Defendants because Defendants Blockratize, Inc. and Adventure One QSS, Inc. maintain their principal place of business and operational headquarters in New York, New York and because all Defendants regularly conduct business, including entering into transactions with consumers, in this District. Each

Defendant has sufficient minimum contacts with and has otherwise purposefully availed themselves of the markets of New York so as to render the exercise of jurisdiction over Defendants by this Court consistent with the traditional notions of fair play and substantial justice.

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the challenged conduct occurred in, was directed to, and emanated from this District.

## FACTUAL ALLEGATIONS

18. Polymarket is a New York-based company founded in 2020 that operates a website and mobile application marketed as a "prediction market." The platform allows users to buy and sell "event contracts"—binary contracts that allow participants to trade on a "Yes" or "No" outcome of a specific future event. The event contract's price fluctuates based on the market's perceived probability of the event occurring and settles at either a fixed maximum payout or zero.

19. Polymarket sells sports events contracts, which are predicated upon the outcome of, and activities related to, sporting events. Although Polymarket characterizes these contracts as prediction-market instruments, they function as bets on specified outcomes of sporting events.

20. In January 2022, the Commodity Futures Trading Commission ("CFTC") barred Polymarket from operating in the United States for operating an unregistered derivatives exchange.[1] After being banned in the United States, Polymarket nominally transferred ownership of the website Polymarket.com to Defendant Adventure One QSS Inc..

[1] Michael Fluhr, *CFTC Settles Enforcement Action Against DeFi Platform Polymarket*, DLA Piper (Jan. 25, 2022), https://www.dlapiper.com/en/insights/publications/2022/1/cftc-settles-enforcement-action-against-defi-platform-polymarket.

Polymarket.com's terms of use prohibited participation by individuals in the United States.[2] Polymarket.com also asked individuals to confirm that they were not located in the United States and imposed an IP-address-based "geofence" to prevent access United States residents.[3]

21. Defendant Polymarket later purchased Defendants QXC LLC and QC Clearing LLC, which had registered with the CFTC as a U.S. event-derivatives market, along with their affiliate QC Tech LLC.

22. On November 25, 2025, the CFTC issued an Amended Order of Designation permitting "QCX LLC d/b/a Polymarket US" to reenter the U.S. market under a regulated framework applicable to federally regulated derivatives exchanges. Polymarket began slowly rolling out U.S. access to its mobile application ("App") through invitations and a waitlist. In or around the middle of May 2026, Polymarket removed its waitlist, permitting widespread U.S. access to its App through the Apple App Store and the Google Play Store. Polymarket continues to restrict U.S. access to its website.[4]

23. Following its reentry into the U.S. market, Defendants aggressively marketed the Polymarket App as a lawful platform for sports-related trading.[5] Polymarket specifically targeted states, such as Texas, in which gambling is illegal (outside of tribal exceptions).[6] And Polymarket expressly advertised itself as an alternative to traditional sportsbooks, such as

---

[2] *Terms of Use*, Polymarket, https://polymarket.com/tos (effective July 17, 2026).
[3] *Geographic Restrictions*, Polymarket, https://help.polymarket.com/en/articles/13364163-geographic-restrictions (last visited July 30, 2026).
[4] *See supra* note 2.
[5] Caitlin Ostroff et al., *We Investigated Polymarket's Deceptive Marketing Campaign. Here's What We Found.*, Wall St. J. (June 22, 2026), https://www.wsj.com/business/media/we-investigated-polymarkets-deceptive-marketing-campaign-heres-what-we-found-51169858; Alaina Demopoulos, *Gambling Addicts are Struggling as Kalshi and Polymarket Explode in the US: 'You Could Be Betting Your Rent Away'*, Guardian (May 19, 2026), https://www.theguardian.com/us-news/ng-interactive/2026/may/19/kalshi-polymarket-gambling-addiction-sports-betting.
[6] Dan Bernstein, *Polymarket Ads Signal U.S. Launch Timeline For Sports Futures*, Sportico (Aug. 21, 2025), https://www.sportico.com/business/sports-betting/2025/polymarket-nfl-sports-prediction-market-1234867823.

DraftKings, FanDuel, and BetMGM. For example, one Polymarket ad listed contract "odds" alongside ones from DraftKings, FanDuel, and BetMGM.




**Figure 1: Polymarket "Legally Trade on Football" Advertisement**

24. Polymarket also represented to consumers downloading its App that it offered legal and authorized opportunities to profit from sports outcomes in the United States. On the Google Play Store, for example, Polymarket states that "Americans can now trade on the World's Largest Prediction Market," advertising its App as offering the chance to trade on "Sports Politics & More" and that users could "Livetrade on every game." Polymarket also used sports betting terminology, noting that it "has the tightest spreads."

25. Similarly, on the Apple App Store, Polymarket markets the App as a way to "Trade Soccer," states that users can "TRADE ON ANYTHING" including "sports," states that it has "Bigger payouts than sportsbooks," and states that "Polymarket is fully legal & CFTC regulated in the United States – in all 50 states."




**Figure 2: Google Play Store**




**Figure 3: Apple App Store**

26. Users opening the Polymarket App are brought directly to sports event contracts. The interface is virtually indistinguishable from traditional sports betting platforms, with offerings such as moneylines, spreads, totals, and proposition bets.




**Figure 4: Polymarket App**

27. These representations conveyed to reasonable consumers that Polymarket's App offers compliant, lawful sports gambling equivalent to licensed sportsbooks.

28. Defendants knew that, at minimum, the legality of its sports event contracts was disputed and uncertain. Defendants had previously been barred from operating in the United States, reentered only through a federal derivatives-exchange framework, and faced ongoing regulatory scrutiny, enforcement actions, and litigation challenging whether their sports events contracts were lawful. Yet Defendants continued to market Polymarket as "fully legal" and authorized without disclosing that material uncertainty.

29. Federal law restricts the offering of "event contracts" tied to certain underlying activities. CFTC regulations provide that "[a] registered entity shall not list for trading or accept for clearing on or through the registered entity . . . [a]n agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, that involves, relates to, or references terrorism, assassination, war, **gaming**, or an activity that is unlawful under any State or Federal law." 17 C.F.R. § 40.11(a)(1) (emphasis added). A registered entity such as Polymarket thus cannot offer "event contracts" related to gaming—including sports events contracts. *See KalshiEX LLC v. Assad*, No. 25-7516, ___ F.4th ___ (9th Cir. Aug. 28, 2026).

30. In addition, state regulators have alleged that Polymarket is operating an unlicensed sportsbook and allowing sports bets without required licensing or consumer protections. Every state plus the District of Columbia either prohibits sports betting outright or requires that all sports betting be conducted through licensed sports bookmakers.[7]

---

[7] Am. Gaming Ass'n, State of the States 2025: The AGA Analysis of the Commercial Casino Industry (May 2025), *available at* https://www.americangaming.org/wp-content/uploads/2025/05/AGA-State-of-the-States-2025.pdf.

31. Polymarket does not have a sports betting license from any state agency,[8] and its sports events are not offered through a state-licensed sportsbook. Defendants did not disclose to consumers that Polymarket lacked sports-wagering licenses from state gaming regulators. That omission was material because reasonable consumers would understand a claim that Polymarket was legal in all 50 states to mean that the App was authorized to offer sports wagering in each state where consumers could download and access the App.

32. Courts and regulators have taken action against Polymarket. States have issued cease-and-desist letters[9] and filed lawsuits[10] against Polymarket, and at least one court has blocked Polymarket's operation.[11]

33. These facts directly contradict Defendants' representations that their App is lawful and authorized.

34. At a minimum, these restrictions render Defendants' blanket representations of legality false, incomplete, and misleading.

---

[8] *Legal Sportsbook Operators*, Am. Gaming Ass'n, https://web.archive.org/web/20260201003317/https://www.americangaming.org/legal-us-sportsbook-operators (archived Feb. 1, 2026).

[9] Letter from Marcus D. Fruchter, Administrator, Ill. Gaming Bd., to QXC LLC d/b/a Polymarket US (Jan. 27, 2026), *available at* https://igb.illinois.gov/content/dam/soi/en/web/igb/documents/sports/cease-and-desist-letters/20260127-cease-desist-letter-polymarket.pdf; Francisco Rodrigues, *Tennessee Orders Kalshi, Polymarket and Crypto.com to Cease Sports Betting Contracts*, CoinDesk (Jan. 10, 2026), https://www.coindesk.com/policy/2026/01/10/tennessee-orders-kalshi-polymarket-and-crypto-com-to-cease-sports-betting-contracts.

[10] Lauren Adams, *Attorney General Coleman Launches Three Lawsuits Against Illegal Gambling Companies*, Commw. Kentucky (June 17, 2026), https://www.kentucky.gov/Pages/Activity-stream.aspx?n=AttorneyGeneral&prId=1944; Press Release, Nev. Gaming Control Bd., Nevada Gaming Control Board Files Civil Enforcement Action Against Polymarket (Jan. 16, 2026), *available at* https://www.gaming.nv.gov/siteassets/content/about/press-release/ngcb-files-civil-enforcement-action-against-polymarket.pdf.

[11] Richard N. Velotta, *Judge Blocks Polymarket from Operating in Nevada*, L.V. Rev. J. (June 2, 2026), https://www.reviewjournal.com/business/casinos-gaming/judge-blocks-polymarket-from-operating-in-nevada-3832277.

35. Defendants were aware that the legality of the sports events contracts offered on their App was, at best, uncertain.

36. Defendants had previously been barred from the U.S. market and reentered only through the CFTC's regulatory framework.

37. Defendants were also aware of ongoing regulatory scrutiny, enforcement actions, and litigation challenging the legality of their business model.

38. Despite this knowledge, Defendants continued to market the App as lawful, without adequately disclosing that it is at best in a legal gray area and at worst unlawful sports gambling prohibited under federal and state laws.

39. Plaintiff and Class members relied on Defendants' representations that Polymarket's App was lawful and compliant.

40. Had Plaintiffs known the true facts, they would not have used the App.

41. As a result, Plaintiffs and Class members suffered economic injury, including losses on unlawful or valueless gambling transactions.

42. Defendants' marketing was deceptive because it conveyed categorical legality and regulatory approval while omitting material facts known to Defendants: that sports event contracts are subject to federal restrictions on gaming-related event contracts; that state law either prohibits sports betting or requires sportsbooks to have licenses; that Polymarket lacked state sports-wagering licenses; and that regulators and courts had challenged or restricted Polymarket's operations. Those omitted facts were material to reasonable consumers deciding whether to use the App and whether the contracts they purchased had lawful value.

## FACTS SPECIFIC TO PLAINTIFFS

43. Plaintiffs Lee and Yee ("Plaintiffs"), individually and on behalf of all other similarly situated, allege the following based on their personal knowledge as to the facts

pertaining to Plaintiffs, and based on the investigation of counsel and information and belief as to all other allegations:

44. Plaintiffs and Class members relied on Defendants' representations that Polymarket's App was lawful and compliant with applicable federal and state law. Had Plaintiffs known the true facts, namely, that sports events contracts on Polymarket's App constitute unlawful gambling, they would not have downloaded the App or purchased sports events contracts on the App.

45. As a result of Defendants' unlawful conduct, Plaintiffs and Class members suffered economic injury, including losses on unlawful gambling transactions.

46. In each Plaintiff's experience, Polymarket functions as a de facto bookmaker on the App, setting the odds, accepting wagers from users, recording each transaction, unilaterally determining the outcomes, and distributing payouts to winning bettors.

47. Throughout the period relevant to this action, Plaintiff Lee has been a resident of San Francisco, California, including during the entire time he purchased sports events contracts on the App.

48. On or about July 12, 2026, after viewing Instagram advertisements on his mobile device promoting a $50 sign-up bonus for new users who applied active promotional codes during registration and made a minimum initial deposit of $20, Plaintiff Lee downloaded the Polymarket App while located in California. At the time, Polymarket communicated to Plaintiff Lee that the products and services available were lawful.

49. Polymarket has continued to convey to Plaintiff Lee, both on the App and elsewhere, that its services are lawful, and Plaintiff Lee relied on these representations of legality when he downloaded the App and purchased sports events contracts.

50. Had Polymarket truthfully disclosed that its sports events contracts constitute unlawful gambling, Plaintiff Lee would not have downloaded the App or purchased sports events contracts on the App.

51. Between approximately July 12 and July 15, 2026, Plaintiff Lee deposited funds into the App and lost approximately $4,400 through the purchase of sports events contracts on the App while located in California.

52. Plaintiff Lee ceased purchasing sports events contracts on the Polymarket App on or around July 15, 2026.

53. Throughout the period relevant to this Complaint, Plaintiff Yee has been a resident of San Ramon, California, including during the entire time he maintained a Polymarket account.

54. On or about April 29, 2026, after viewing advertisements for Polymarket on the Instagram and Facebook apps and sites through his phone and desktop, Plaintiff Yee downloaded the Polymarket App while located in California. At the time, Polymarket communicated to Plaintiff Yee that the products and services available in California were lawful.

55. Polymarket has continued to convey to Plaintiff Yee, both on the App and elsewhere, that its services are lawful, and Plaintiff Yee relied on these representations of legality when he downloaded the App and purchased sports events contracts.

56. Had Polymarket truthfully disclosed that its sports events contracts constitute unlawful gambling, Plaintiff Yee would not have downloaded the App or purchased sports events contracts on the App.

57. Between approximately April 29, 2026 to May 18, 2026, Plaintiff Yee deposited funds into the App and lost approximately $2,600 through the purchase of sports events contracts on the App while located in California.

58. Plaintiff Yee ceased purchasing sports events contracts on the Polymarket App on or around May 18, 2026

59. Although Plaintiff Yee has stopped using Polymarket in California, he retains an interest in lawful device-based gambling and would resume such activity if it were authorized by law. Plaintiff Yee remains at risk of being misled into further unlawful gambling so long as Polymarket continues to hold its sports events contracts as lawful.

60. Each Plaintiff's contract with Polymarket (to the extent any such contract was otherwise ever formed), is void (and was void ab initio) pursuant to, among other authorities, New York General Obligations Law § 5-411, which provides that "[a]ll contracts for or on account of any money or property, or thing in action wagered, bet or staked … shall be void," New York General Obligations Law § 5-413, which renders void all securities and contracts where the consideration is for money won by playing at any game or by betting on the sides of those who play, and the well-established common-law principle that New York courts will not enforce contracts that are illegal, against public policy, or otherwise deficient. *See also* N.Y. Gen. Bus. Law § 340 (declaring contracts against public policy, illegal, and void); N.Y. Gen. Oblig. Law § 5-415 (voiding transfers of property made in pursuance of any lottery or device determined by lot or chance).

61. If the contracts of Plaintiffs are not void under New York law, then (to the extent any such contract was otherwise ever formed), they are void (and was void ab initio) pursuant to, among other authorities, California Civil Code Section 1667, which makes contracts invalid where the contract is: "1. Contrary to an express provision of law; 2. Contrary to the policy of express law, though not expressly prohibited; or 3. Otherwise contrary to good morals."

## CLASS ACTION ALLEGATIONS

62. Plaintiff brings this action on behalf of a nationwide class defined as:

> All individuals residing in the United States who entered into sports events contracts on Polymarket's mobile application.

63. The following people are excluded from the proposed class: (1) any Judge or Magistrate Judge presiding over this action and the members of their family; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or its parents have a controlling interest and their current employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel, and their experts and consultants; and (6) the legal representatives, successors, and assigns of any such excluded persons.

64. This definition is subject to modification as discovery discloses further information. Plaintiffs reserve the right to propose subclasses if discovery reveals that such subclasses are appropriate.

65. This case is properly maintainable as a class action pursuant to and in accordance with Federal Rule of Civil Procedure 23 in that:

a. The Class, which include thousands of members, are so numerous that joinder of all Class Members is impracticable;
b. There are substantial questions of law and fact common to the Class, including those set forth in greater particularity herein;
c. Questions of law and fact, such as those enumerated below, which are common to the Class, predominate over any questions of law or fact affecting only individual members of the Class;
d. The claims of the representative parties are typical of the claims of the Class;
e. A class action is superior to any other type of action for the fair and efficient adjudication of the controversy;
f. The relief sought in this class action will effectively and efficiently provide relief to all members of the Class (collectively, "Class Members");

g. The prosecution of separate lawsuits by members of the Class would risk inconsistent or varying adjudications. Class-wide adjudication of these claims is, therefore, appropriate.

h. There are no unusual difficulties foreseen in the management of this class action; and

i. Plaintiffs, whose claims are typical of those of the Class and Subclass, through their experienced counsel, will zealously and adequately represent the Class and Subclass.

***Numerosity***

66. The proposed class contains members so numerous that separate joinder of each member of the class is impractical. There are tens or hundreds of thousands of class members.

67. Class members can be identified through Defendants' sales records and public notice.

***Predominance of Common Questions***

68. There are questions of law and fact common to the proposed class, including:

a. Whether Defendants represented that Polymarket's sports event contracts were lawful;

b. Whether those representations were false or misleading;

c. Whether Defendants omitted material facts regarding the legal status of sports events contracts;

d. Whether Defendants violated New York General Business Law;

e. Whether Class members were injured by Defendants' conduct.

f. Whether Class members are entitled to damages.

***Typicality***

69. Plaintiff's claims are typical of those of all Class Members. If brought and prosecuted individually, the claims of each Class Member would require proof of substantially

the same material and substantive facts, utilize the same complex evidence (*e.g.*, expert testimony), rely upon the same legal theories, and seek the same type of relief.

70. The claims of the Plaintiffs and other Class Members have a common cause, and their damages are of the same type. The claims originate from the purchase of sports event contracts from Polymarket through its mobile application.

71. All Class Members have been aggrieved by Defendants' actions and omissions and are entitled to, *inter alia*, statutory damages.

***Adequacy***

72. Plaintiffs' claims are sufficiently aligned with the interests of the absent Class Members to ensure that the claims of the Class will be prosecuted with diligence and care by Plaintiffs as representatives of the Class. Plaintiffs will fairly and adequately represent the interests of the Class and do not have interests adverse to the Class.

73. Plaintiffs have retained the services of counsel who are experienced in complex class action litigation. Plaintiffs' counsel will vigorously prosecute this action and will otherwise protect and fairly and adequately represent the Plaintiffs and all absent Class Members.

***Superiority***

74. A class action is superior to all other available methods for the fair and efficient adjudication of this litigation because:

a. Individual litigation by individual Class Members is impractical as the costs of pursuit would far exceed what any one Class Member has at stake;

b. Individual litigation by individual Class Members would create a risk of inconsistent or varying adjudication, which would present Defendants with incompatible standards of conduct;

c. Little or no individual litigation has been commenced over the controversies alleged in this Complaint and individual Class Member are unlikely to have an interest in separately prosecuting and controlling individual actions;

d. The Plaintiffs seek relief relating to Defendant's common actions, and the equitable relief sought would commonly benefit the Class as a whole;

e. The concentration of litigation of these claims in one action will achieve efficiency and promote judicial economy; and

f. The proposed class action is manageable.

## CAUSES OF ACTION

## COUNT I

**<u>Violation of N.Y. General Business Law § 349 (Unfair, Deceptive, or Abusive Acts)</u>**

75. Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

76. New York General Business Law ("NY GBL") § 349 declares unlawful "deceptive . . . acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

77. NY GBL § 349 applies to Plaintiff and Class Members because Polymarket is headquartered in and operates out of the New York state, Polymarket's mobile application has a New York choice-of-law provision in its Terms of Service,[12] and the State of New York has a strong interest in preventing false advertising and deceptive business practices by companies headquartered in the state.

---

[12] *Polymarket App – Terms & Conditions (ISV Front End)*, Polymarket https://polymarket.us/tos (effective Sept. 25, 2025).

78. Any person who has been injured by reason of a deceptive act in violation of NY GBL § 349 may bring an action in his or her own name to enjoin such deceptive acts or practices, an action to recover their actual damages or fifty dollars, whichever is greater, or both such actions. The Court may, in its discretion, increase the award of damages to an amount not exceeding three times the actual damages, in addition to one thousand dollars per violation, if the court finds that Defendants willfully or knowingly violated this section. The Court may award reasonable attorneys' fees to a prevailing Plaintiff.

79. The practices employed by Defendants, by which it advertises and promotes sports events contracts, are materially misleading and deceptive within the meaning of NY GBL § 349. Defendants market sports events contracts as lawful, when in fact federal law prohibits listing of gaming contracts on registered markets, and Polymarket is not licensed as a legal sports bookmaker in any state. At best, Polymarket's sports contracts are in a legal gray area.

80. Defendants' acts and practices deceived Plaintiff and the Class. Plaintiff and the Class reasonably relied on these representations and believed they were purchasing legal sports events contracts when in fact they were at best purchasing contracts whose legal status is uncertain and at worst were engaged in illegal sports gambling.

81. As a direct and proximate result of Defendants' violations of NY GBL § 349, Plaintiff and Class members have suffered actual injury in the form of monies lost on Defendants' App.

82. Defendants' conduct has caused and continues to cause immediate and irreparable injury to Plaintiff and the Class and will continue to mislead consumers unless enjoined by this Court.

**COUNT II**

**<u>Violation of N.Y. General Business Law § 350 (False Advertising)</u>**

83. Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

84. By reason of the acts set forth above, Defendant has been and is engaged in consumer-oriented advertising and marketing against Plaintiff and the Class, engaging in business conduct that is false and misleading in material respects, in violation of NY GBL § 350, which provides, in part, that "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

85. Defendants caused statements that were untrue or misleading, and which they knew to be untrue or misleading, to be disseminated throughout New York State and elsewhere, through advertising, marketing, and other publications. In particular, Defendants marketed Polymarket as providing legal sports betting when in fact its sports events contracts are at best in a legal gray area and at worst prohibited by federal law and state law across all 50 states and the District of Columbia.

86. Defendants' misrepresentations were material and substantially uniform in content, presentation, and impact upon consumers at large. Consumers were and continue to be exposed to Defendants' material misrepresentations.

87. Defendants disseminated their false advertising to the public at large in the course of their business operations in New York and elsewhere.

88. Plaintiff and the Class have been deceived and injured by Defendants' false advertising, as they purchased sports events contracts on Polymarket under the mistaken belief that they were not participating in either illegal gambling or purchasing contracts whose legality was uncertain.

89. Plaintiff and the Class have no adequate remedy at law.

90. Defendants' conduct has caused and is causing immediate and irreparable injury to Plaintiff and the Class and will continue to damage both Plaintiff and the Class and deceive the public unless enjoined by this Court.

91. Pursuant to NY GBL § 350-e, Plaintiff and the Class seek monetary damages, including actual damages or five hundred dollars, whichever is greater; injunctive relief; restitution; disgorgement of monies obtained by means of Defendants' unlawful conduct; interest; and attorneys' fees and costs as permitted by law.

92. Defendants' conduct substantially injured the public because consumers were exposed to and relied upon Defendants' false advertising when deciding whether to purchase sports event contracts. By marketing Polymarket as a lawful alternative to licensed sportsbooks, Defendants misled reasonable consumers into purchasing sports contracts that were, at best, of uncertain legal status, and at worst, illegal sports gambling.

93. Defendants' conduct thus caused real-world harm and poses an ongoing risk of further injury if not enjoined.

**PRAYER FOR RELIEF**

94. WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class, pray for relief and judgment:

a. certifying the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiffs as representatives of the Class, and designating Plaintiffs' counsel as Class Counsel;

b. awarding Plaintiffs and the Class compensatory damages and actual damages, trebled, in an amount exceeding $5,000,000, to be determined by proof;

c. awarding Plaintiffs and the Class appropriate relief, including actual and statutory damages;

d. awarding Plaintiffs and the Class exemplary and punitive damages;

e. awarding Plaintiffs and the Class civil penalties;

f. granting Plaintiffs and the Class declaratory and equitable relief, including restitution and disgorgement;

g. enjoining Defendant from continuing to engage in the wrongful acts and practices alleged herein;

h. awarding Plaintiffs and the Class the costs of prosecuting this action, including expert witness fees;

i. awarding Plaintiffs and the Class reasonable attorneys' fees and costs as allowable by law;

j. awarding pre-judgment and post-judgment interest; and

k. granting any other relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

95. Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted,

Dated: September 3, 2026 By: *<u>/s/ Todd S. Garber</u>*

Todd S. Garber
FINKELSTEIN, BLANKINSHIP,
FREI-PEARSON & GARBER, LLP
One North Broadway, Suite 900
White Plains, NY 10601
Tel: (914) 298-3281
tgarber@fbfglaw.com

Caleb Marker
ZIMMERMAN REED LLP
6420 Wilshire Blvd., Suite 1080
Los Angeles, CA 90048
Tel: (877) 500-8780
Email: caleb.marker@zimmreed.com